UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CORTEZ BROWN,

         Plaintiff,

    v.

RICHARD WATSON, TRINITY SERVICE
GROUP, and DR. DAVID MARCOWITZ,

         Defendants.

Case No. 21-cv-138-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on three motions for summary judgment, one filed by
each of the three defendants, Trinity Service Group (Doc. 133), David Marcowitz (Doc. 136),
and Richard Watson (Doc. 141).  Plaintiff Cortez Brown has responded to the motions (Doc.
149), and Dr. Marcowitz has replied to that response (Doc. 150).  The Court will grant all three
motions for summary judgment because Brown has pointed to no evidence from which a
reasonable jury could find the defendants violated Brown's constitution rights because of his
conditions of confinement.  Additionally, Watson is entitled to qualified immunity for his
response to the unprecedented COVID-19 pandemic in a correctional facility.

## I.      Background

Brown filed this civil rights action *pro se* pursuant to 42 U.S.C. § 1983 for constitutional
deprivations that he claims occurred during his detention at the St. Clair County Jail ("Jail").  He
alleges that defendants St. Clair County Sheriff Richard Watson and Trinity Service Group were
responsible for unhealthy and unsafe conditions of confinement due to the use of e-cigarettes,
overcrowding, insects, and mold in the Jail during the COVID-19 pandemic (Counts 1 and 2).

He alleges that Dr. Marcowitz, the medical director of the Jail, behaved unreasonably

and/or with deliberate indifference to Brown's health needs because he did not take sufficient steps to prevent, diagnose, and contain the COVID-19 coronavirus (Count 3) and because he failed to provide Brown with adequate medical care when he contracted the disease (Count 4). He specifically alleges that Dr. Marcowitz refused to test him for COVID-19 on a number of occasions, to provide personal protective equipment ("PPE") for Jail inmates, and to test and separate actually or potentially infected inmates from others. He asserts that these failures resulted in an outbreak of 300 COVID-positive inmates and 3 inmate deaths by January 2021.

He asserts that in so acting, all the defendants violated either his Fourteenth Amendment due process rights or his Eighth Amendment right to be free from cruel and unusual punishment, depending on whether he was a convicted inmate or a pretrial detainee at the time.

## II.      Standards for Summary Judgment

Summary judgment is appropriate only if the moving party can show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the burden of establishing that no material facts are genuinely disputed. *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). Any doubt about the existence of a genuine issue must be resolved in favor of the nonmoving party. *Id.*

When presented with a motion for summary judgment, the Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence." *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019) (internal quotations omitted); *accord Hansen v. Fincantieri Marine Grp.,* 763 F.3d 832,

836 (7th Cir. 2014).

Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotations omitted).  The Court must then "view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836 (internal quotations omitted).  If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (internal quotations omitted).

**III.    Facts**

Viewed in Brown's favor, the relevant evidence establishes the following facts.

A.    Brown's Detention

Brown was detained in the Jail from March 28, 2020, to May 17, 2021.  He was first detained for violation of his terms of supervised release in Case No. 00-cr-30033-NJR, then as of June 25, 2020, also on pretrial detention in Case No. 20-cr-30064-NJR.  Brown was sentenced on the new charges and the supervised release violation on April 8, 2021, and in May 2021, he was transferred to a federal correctional facility.

During Brown's time at the Jail, inmates could buy e-cigarettes from the Jail commissary. The Jail used Trinity's banking software to process and track commissary orders, but the Jail maintained control over what items were offered and sold at the commissary.  When a detainee wanted to purchase e-cigarettes from the Jail's commissary, he would submit a paper form to a Jail officer, who would then manually enter the order into Trinity's banking software to charge the detainee for the purchase.  Jail personnel then distributed the e-cigarettes to the inmates who

had purchased them.

Detainees could seek medical care by submitting a sick call request to a nurse, who reviewed the request to determine if the detainee needed to see a doctor.

B.      COVID-19 Pandemic

Brown's detention at the Jail in March 2020 coincided with the COVID-19 pandemic. Because of the pandemic, the Jail provided its staff with masks, but not detainees. Brown was screened for COVID-19 as part of his Jail intake screening and was then sent to H Block, the part of the Jail where federal detainees were held. Brown was particularly bothered by detainees' use of e-cigarettes because he believed the vapor they emitted could transmit the COVID-19 virus and because he believed COVID-19 was transmitted through saliva when detainees shared e-cigarettes.

At some point, a federal detainee in H Block was exposed to a federal court security officer with COVID-19. As a consequence, Jail medical staff monitored all H Block detainees by taking their temperatures twice daily for two weeks. On July 2, 2020, Brown was tested for COVID-19, and the test was negative. He did not contract COVID-19 while housed in H Block.

In August 2020, after getting into an altercation in H Block, Brown was moved to AA Block, another part of the Jail where detainees charged with state crimes were housed. AA Block consisted of a large central area—the dayroom—surrounded numerous two-man cells. All of the cells in AA Block were occupied, and often a third person was placed in the cell or in the dayroom to sleep on the floor. Unlike in H Block, in AA Block, detainees were brought in from the street and out quite frequently, so the risk of exposure to COVID-19 was higher than it was in H Block. Brown characterized it as a "rotating door."

C.      Brown's COVID-19

Brown remained COVID-19-free until January 2021, when his cellmate tested positive.
After testing positive, Jail officers returned the cellmate to the cell he shared with Brown rather
than isolating him elsewhere.  A Jail sergeant gave Brown the option of remaining in the cell
with the infected detainee or moving out and sleeping on the floor elsewhere.  Brown refused
because he thought his infected cellmate should be the one forced to move instead of him, and
Brown did not want to sleep on the floor.  An hour later, the officer returned and told Brown he
no longer had the option of moving out since he had been exposed to his infected cellmate.  They
were locked down in the cell together for fourteen days.  The day after being locked down with
his infected cellmate, Brown asked to be tested for COVID-19, although he was experiencing no
symptoms.  The test was negative.  A few days later Brown was tested again, and this time the
test was positive.  At that point, Brown had lost his sense of taste and smell and was nauseous.

Upon learning that Brown had tested positive for COVID-19, Dr. Marcowitz prescribed
Tylenol (for aches and fever) and Guaifenesin (for congestion) for fourteen days.  Dr.
Marcowitz's medication prescription was consistent with guidelines of the Centers for Disease
Control and Prevention ("CDC") at that time to treat symptoms because there was no cure.
Brown started receiving medication about a week after he tested positive.  Although his medical
records show he received it twice a day for fourteen days, he actually only received it for three or
four days, and it did not make him feel any better.  He was unable to eat for ten days and lost
twenty pounds.  His symptoms subsided over the next few weeks, and on February 11, 2021, he
tested negative for the virus.

D.      Post-COVID-19

Brown was given another COVID-19 test, which was negative, right before being

5

vaccinated against the coronavirus on March 16, 2021.  He was also given a mask to wear.  The following day, he had an annual physical in which his chest x-ray was normal.  On May 17, 2021, he was moved from the Jail to federal custody.  In an examination at a federal facility in mid-August 2021, he showed no symptoms of COVID-19.

Before he reached the Jail, Brown had preexisting sinus trouble and high blood pressure. Since having COVID-19, Brown suffers shortness of breath and fatigue when doing strenuous activities, and has thyroid problems, all of which he attributes to his bout with COVID-19.

E.     Other Conditions of Confinement

Also during Brown's stay at the Jail, AA Block had gnats and bugs everywhere, and there was mold in the showers.  The Jail was treated twice a month for insects and other pests.  Ample cleaning supplies were distributed daily to inmates to clean the showers.

IV.    Discussion

A.     Legal Standards

To show that conditions of confinement violated the constitution, a plaintiff must prove two things.  First, the conditions of confinement must be objectively serious enough to pose a substantial risk of serious harm; they must result in the denial of "'the minimal civilized measure of life's necessities.'"  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015). Second, the official must have a sufficiently culpable state of mind.  *Farmer*, 511 U.S. at 834.

For pretrial detainees, the sufficiently culpable state of mind has changed in the past decade.  Historically, the Court applied to convicted prisoners and pretrial detainees the same Eighth Amendment standard of deliberate indifference to the needs of prisoners.  *See Miranda v. County of Lake*, 900 F.3d 335, 350-51 (7th Cir. 2018); *Burton v. Downey*, 805 F.3d 776, 784 (7th

Cir. 2015).  A defendant is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 837.

However, the Court of Appeals for the Seventh Circuit, relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), has since held that the objective reasonableness standard, not the deliberate indifference standard, applies to all conditions-of-confinement claims brought by pretrial detainees.  *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019).  *Miranda* held that the controlling inquiry consists of two steps.  The first step focuses on the intentionality of the defendant's conduct and asks "whether the . . . defendant[] acted purposefully, knowingly, or perhaps even recklessly when [he] considered the consequences of [his] handling of [plaintiff's] case."  *See Miranda*, 900 F.3d at 353.  The second step asks whether the challenged conduct was objectively reasonable based on the totality of the circumstance faced by the defendant.  *Id*. at 354.  This last inquiry is made without regard for the defendant's subjective state of mind.  *See McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022).

Brown was a pretrial detainee during the most relevant times, including when he was exposed to and contracted COVID, so the applicable legal standard for his conditions of confinement claim is the Fourteenth Amendment's objective reasonableness standard.  *See Miranda*, 900 at 352.[1]  The Court now turns to each defendant's motion to determine if they were objectively unreasonable in response to conditions of confinement posing objectively serious harm to Brown.

---

[1] Brown might be considered a convicted criminal because he was also being held for a violation of his supervised release.  And after he was sentenced in federal court on April 8, 2021, he was, indeed, a convicted prisoner.  However, for the purposes of the defendants' summary judgment motions. the Court applies the objective reasonableness standard presented by the Fourteenth Amendment rather than the deliberate indifference standard of the Eighth Amendment.

B.     Trinity's Motion for Summary Judgment (Doc. 133)

Trinity is a non-governmental organization that processed and tracked detainees' e-cigarette purchases from the Jail.  The Jail sold the e-cigarettes through its commissary to detainees and used Trinity's software to process the payments.  Trinity asks for summary judgment on the grounds that it was not involved in deciding what commissary items were allowed in the Jail; it merely processed and tracked detainees' purchase requests.  Further, it argues that selling e-cigarettes in the Jail is not unconstitutional and that Brown cannot show he suffered any harm from that practice.  It seeks summary judgment on Count 1, Brown's Fourteenth Amendment claim for a policy, custom, or practice of allowing e-cigarettes at the Jail.

To determine whether a private corporation like Trinity can be liable under § 1983, the Court applies municipal liability standards.  *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017).  A municipality may only be liable for its own actions as a municipality.  *Monell v. Dep't of Social Servs*., 436 U.S. 658, 690-92 (1978).  Municipal action occurs where (1) the municipality had an express policy calling for a constitutional violation, (2) the municipality had a widespread practice of constitutional violations that was so permanent and well settled as to constitute a custom or usage with the force of law, or (3) if a person with final policymaking authority for the municipality caused the constitutional violation.  *Id.* at 694.  And the policy, custom, or decision must be the moving force behind the constitutional violation.  *Id.* Essentially, Brown targets Trinity's policy of processing and tracking e-cigarette orders for the Jail.

As discussed in the previous section, to show that a constitutional violation occurred based on a condition of confinement, a plaintiff must prove that the conditions of confinement

were objectively serious enough to pose a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)*,* and that the defendant was objectively unreasonable in his conduct, *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019).

Brown stumbles on the first step.  There is no evidence that the use of e-cigarettes in the Jail posed a substantial risk of serious harm to Brown or effectively denied him the civilized measure of life's necessities.  This is true even when COVID-19 was prevalent.  Brown speculates that the transmission of the COVID-19 virus was greater and more dangerous in the vapor emitted from e-cigarettes that it was without the e-cigarette vapor.  There is no evidentiary support for such speculation.  While the vapor may have been more visible than ordinary breath, there is no scientific evidence on file to shows e-cigarettes increased the risk of COVID-19 beyond the risk posed by simply breathing.

Additionally, there is no evidence to support the notion that Brown contracted COVID-19 from e-cigarette vapor or sharing an e-cigarette with another inmate, or even that second-hand e-cigarette vapor caused or exacerbated any of Brown's other ailments.

Furthermore, even if e-cigarettes in the Jail created an unconstitutional condition, the *Jail's* decision to allow detainees to purchase e-cigarettes would be the moving force behind such a constitutional violation.  The Jail, not Trinity, controlled what came into the Jail, and Trinity cannot be liable for that decision.

There is simply no basis for holding Trinity liable under § 1983 merely because it processed and tracked e-cigarette sales for the Jail.

C.     Watson's Motion for Summary Judgment (Doc. 141)

In Sheriff Watson's motion for summary judgment, he argues with respect to Count 1, the count also against Trinity, that Brown cannot show that the sale of e-cigarettes in the Jail was

unconstitutional without scientific evidence that e-cigarette vapor posed a serious risk of harm at the concentrations found in the Jail.  With respect to Count 2, Watson argues that Brown cannot show that the other conditions of confinement he cites posed a serious risk to Brown's health. With respect to all counts, Watson argues that Brown cannot show that the Jail responded improperly to the risks posed by those conditions.  He also asserts qualified immunity.

### 1.   Count 1

Watson is entitled to summary judgment on Count 1 for some of the same reasons Trinity is.  Watson, as the Sheriff in charge of and the policymaker for the Jail, is responsible for the Jail's policy of allowing e-cigarettes in the Jail.  However, as noted earlier, no evidence suggests e-cigarette vapor increased the risk of COVID-19 to inmates or that the concentration of second-hand e-cigarette vapor in the Jail increased the risk of other health problems.  In the absence of any evidence of an increased risk of harm from e-cigarettes, Brown cannot show that Watson's decision to allow them in the Jail was objectively unreasonable.

### 2.   Count 2

With respect to Count 2, Brown's claim about e-cigarette vapor, overcrowding, insects, and mold, Watson argues that Brown cannot show these conditions, either individually or in combination, were objectively serious enough or lengthy enough to rise to the level of a constitutional violation.

As noted above, pretrial detainees are entitled to "the minimal civilized measure of life's necessities," including such things as "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities."  *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (internal citations and quotations omitted); *Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015) (food, clothing, shelter, and medical care).  The objective reasonableness of a plaintiff's

conditions of confinement depends on the duration and severity of his exposure to the conditions. *See Hardeman*, 933 F.3d at 824.  Only after finding objectively serious conditions does  the Court even consider the reasonableness of a defendant's conduct.

No reasonable jury could find based on the existing evidence that the conditions Brown faced were objectively serious in that they denied him "the minimal civilized measure of life's necessities" or exposed him to conditions "posing a substantial risk of serious harm."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The Court considers the conditions individually and in combination, taking account of their severity and duration.

As a result of Jail overcrowding and the need for isolating inmates sick with or exposed to COVID-19, there were not enough beds for all the detainees.  At least in AA Block, this meant that some detainees were forced to sleep on the floor either in the dayroom or as the third inmate in a two-man cell.  Brown does not point to any other consequence of alleged overcrowding in the Jail that might be deemed intolerable in human society.  *See Rhodes v. Chapman*, 452 U.S. 337, 348 (1981).  It is true that sleeping on the floor would not have been pleasant.  It posed inherent problems such as discomfort, proximity to insects and substances spilled on the floor, and being stepped on by others.  However, sleeping on the floor was not so bad and so long as to deprive a detainee of one of life's necessities.  Offering it as an option to remaining in a cell with a COVID-positive detainee was not offering an unconstitutional choice.  And in fact, Brown never slept on the floor because he refused to comply with the Jail's decision about how to isolate Brown's cellmate.

Brown also complains about unsanitary conditions such as insects and mold in the showers.  The mere presence of insects and mold is not, by itself, evidence of unconstitutional conditions.  No evidence suggests that the level if insect infestation approaches the outrageously

excessive levels found to be objectively serious in other cases.  *See Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) ("cockroaches that were 'everywhere,' 'crawling on his body' (along with mice) and 'constantly awaken[ing]' him, and 'causing the environment to be unsanitary" and caused significant harm; the jail sprayed for pests only twice in sixteen months); *White v. Monohan*, 326 F. App'x 385, 388 (7th Cir. 2009) (over five years, "'bugs, roaches, spiders, wasps, [and] bees' had bitten and stung him so often as to leave multiple scars, wounds, and sores, causing him internal injuries").  The evidence shows that the Jail was exterminated twice a month, although it was not 100% effective.  Nevertheless, the evidence does not reveal the kind of intolerable situation that a jury could find an objectively serious condition.

As for mold, it can pose a serious health risk.  *See, generally*, Nat'l Ctr. for Enviro. Hlth., Basic facts about mold and dampness (Nov. 14, 2022), available at https://www.cdc.gov/ mold/faqs.htm (visited Mar. 15, 2024).  But Brown alleges mold was only in the showers, which were cleaned daily—or at least adequate cleaning supplies were provided daily to inmates to clean the shower.  Brown's speculation that his limited exposure to mold caused his health problems is unsupported by the evidence.  No reasonable jury could find that Brown's exposure to mold in the showers amounted to an objectively serious condition, especially where there is no evidence that it caused any illness.

Even in combination, the e-cigarette use, the lack of bed space for every detainee, the insects, and the mold in the shower do not come close to suggesting the environment was intolerable in human society.  In the context of detention facilities where dozens of people live in confined quarters, society does not demand pristine living conditions.  And when special circumstances like the COVID-19 pandemic wreak havoc on a jail's normal operations, the Jail must be given certain leeway in accommodating detainees' and staff's health and safety.  The

measures Watson implemented for the Jail were within the bounds of reasonableness, and no jury could find otherwise.

### 3.     Count 3

In Count 3, Brown claims that Watson unconstitutionally exposed him to the COVID-19 virus and inmates infected with it, failed to provide him with protective gear such as masks, and failed to adequately test for the virus.  Watson argues that his response to the dangers of the COVID-19 pandemic were appropriate, even if they did not perfectly track the guidelines of the CDC or prevent all cases of COVID-19.

When determining whether a reasonable jury could find Watson's response to the COVID-19 pandemic was objectively unreasonable, the Court looks to the totality of the circumstances rather than to individual countermeasures or the lack of them.  *See Mays v. Dart*, 974 F.3d 810, 819-20 (7th Cir. 2020).  The Court must also respect correctional administrators' superior expertise in matters involving internal order and discipline as well as institutional security.  *Id.* at 820 (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).  Only when correctional administrators have an exaggerated response to institutional management challenges should a court not defer to their judgment.  *Id.* at 820 (citing *Bell*, 441 U.S. at 548).

The evidence shows that Jail staff were issued masks but inmates were not.  It also shows the Jail took measures to monitor for COVID-19 and prevent its spread.  For example, when a detainee in H Block was exposed on a trip to court, the jail tested inmates in the same cell block and monitored their temperature twice daily.  Where there was more traffic in and out of the AA Block, the Jail attempted to isolate ill inmates.  In fact, it unsuccessfully attempted to remove Brown from his cell when his cellmate tested positive, but Brown refused to go because he thought the cellmate should have been removed instead.  The two were then locked down to

prevent the infection of others in the AA Block.  And the Jail tested Brown for COVID-19 each time he requested.

While these prevention measures were not perfect, no reasonable jury could find them unreasonable in light of the unique circumstances presented by the COVID-19 pandemic in a correctional setting.  The masks provided to staff helped reduce the risks that any virus staff brought in from the outside would be spread to detainees.  The monitoring in H Block after a potential exposure showed that the Jail was making efforts to detect the virus to prevent transmission when there was reason to think an infection may exist.  And the efforts to separate Brown from his infected cellmate were reasonable even though Brown might have preferred some other means of separation.  Separating infected or exposed inmates from uninfected inmates in a correctional setting in a pandemic is a monumental task, and no reasonable jury could find the Jail's way of trying to accomplish this task was unreasonable, even if it was not 100% effective in preventing infections.

It is true that other means of preventing transmission were not used, like giving inmates masks.  However, the Court defers to Jail administrators on the advisability of giving inmates a means of concealing their identity or contraband behind a mask, especially when the administrators were using the other prevention strategies discussed above.  That those strategies did not perfectly match CDC recommendations for non-correctional settings does not mean they were objectively unreasonable in the circumstances the Jail faced.  In sum, considering the totality of the circumstances and in light of the broad discretion Jail administrators should be given to address the pandemic, no reasonable jury could find Watson's decisions for the Jail objectively unreasonable.

4.    Qualified Immunity

Notwithstanding the foregoing findings, Watson claims he is entitled to qualified immunity for his decisions in managing the Jail while Brown was housed there.

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). The qualified immunity test has two prongs: (1) whether the official violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018); *Pearson*, 555 U.S. at 232; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The Supreme Court encourages, but does not require, examining the second prong before diving into the merits of the plaintiff's claim where it is not necessary. *Wesby*, 583 U.S. at 62 n.7 (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)); *accord McGee*, 55 F.4th at 572.

Under the second prong, the law at the time of the conduct "must have placed the constitutionality of the officer's conduct beyond debate" such that "every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (internal quotations omitted). It must have been "settled law," that is, it must have been "dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 63 (internal quotations omitted). Generally, this requires a high degree of specificity in the precedent so that every reasonable officer would have been alerted to the law in the particular circumstances. *Id.* And it is incumbent on the plaintiff to show the clear establishment of the law in the particular circumstances. *Denius*, 209 F.3d at 950.

15

With respect to Count 3, it should come as no surprise that there is little, if any, caselaw regarding how a modern jail must respond to a pandemic on the scale of the COVID-19 event.  It was unprecedented and, for much of the time Brown was in the Jail, misunderstood.  At the outset, there was conflicting authority regarding the manner of transmission and the advisability of using a mask.  COVID-19 tests were not plentiful at that time, and vaccines had not even been invented.  Administrators of jails and other correctional facilities were faced with new and unprecedented challenges every day without the benefit of judicial precedents to guide them.  Indeed, Brown has not pointed to any clearly established law regarding how the Jail should have responded to the challenges of the COVID-19 pandemic.  For this reason, the Court finds Watson is entitled to qualified immunity on Count 3.

With respect to Counts 1 and 2, Brown has failed to point to a specific case analogous to his situation that clearly established Watson's decisions regarding Jail policy—allowing e-cigarettes to be sold to detainees, dealing with overcrowding, and responding to insect infestation and mold—were unconstitutional.  Therefore, Watson is entitled to qualified immunity on Counts 1 and 2 as well.

For all of the foregoing reasons, the Court will grant Watson's motion for summary judgment.

C.   Dr. Marcowitz's Motion for Summary Judgment (Doc. 136)

In his motion for summary judgment, Dr. Marcowitz argues with respect to Count 3, the allegations that he took insufficient countermeasures to prevent the spread of COVID-19, that he was not involved in implementing the Jail's countermeasures.  Alternatively, he argues that he reasonably responded to the risks by monitoring and testing inmates' COVID-19 status, even if the response was not perfectly in line with the CDC's regulations.  He notes that Brown was

16

tested for COVID-19 each time he requested to be tested—and more—and that after a positive test, Dr. Marcowitz prescribed Tylenol and Guaifenesin for Brown's symptoms.

       1.     <u>Count 3</u>

In Count 3, Brown claims that Dr. Marcowitz was responsible for unconstitutionally exposing him to the COVID-19 virus and inmates infected with it, failing to provide him with protective gear such as masks, and failing to adequately test him for the virus. These are the same claims Brown levied against Watson. Dr. Marcowitz notes that he had no control over cell assignments for the purposes of quarantining detainees. He further denies that was involved in or responsible for implementing COVID-19 preventative measures such as PPE, sanitation, social distancing, or quarantining. Alternatively, he argues that his monitoring and testing of inmates for COVID-19 was a reasonable response to the risk, and that Brown cannot show those measures conflicted with CDC recommendations. He notes that Brown was tested for COVID-19 each time he asked to be tested, and there is no medical evidence his later health problems were caused by COVID-19.

As noted above, the state of mind requirement for Fourteenth Amendment due process claims for conditions of confinement calls for a two-part inquiry. First, the question is "whether the medical defendant[] acted purposefully, knowingly, or perhaps even recklessly when [he] considered the consequences of [his] handling of [plaintiff's] case." *See Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018). Second, the question is whether the challenged conduct was objectively reasonable based on the totality of the circumstance faced by the defendant. *Id*. at 354. This last inquiry is made without regard for the defendant's subjective state of mind. *See McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022).

Dr. Marcowitz first challenges Brown's ability to show he was personally involved in

decisions regarding quarantine and isolation, giving masks or other PPE to detainees, or directing

a plan of COVID-19 testing that actually resulted in Brown's exposure to the virus.

"[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged

constitutional deprivation.  The plaintiff must demonstrate a causal connection between (1) the

sued officials and (2) the alleged misconduct."  *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th

Cir. 2017) (internal quotations and citations omitted).

There is no evidence in the record that Dr. Marcowitz had any control over, or even input

on, Jail administration decisions such as moving or housing detainees—including implementing

or enforcing social distancing, quarantine, or isolation.  Nor is there evidence he was involved in

deciding whether or how to distribute PPE and sanitizers, deciding how often to sanitize areas

inside the Jail, or implementing any overall program of testing detainees.

Brown claims that Dr. Marcowitz must have had some input into the Jail's COVID-19

prevention measures because the health services department at the Jail works directly with Jail

administrators and because Dr. Marcowitz has an ethical responsibility to address COVID-19

measures with Jail administrators.  This is pure speculation.  The evidence shows that Dr.

Marcowitz's authority was limited to direct patient care—*i.e.*, reviewing detainees' medical

records and examining and treating individual detainees.  He bore no responsibility for other

COVID-19 countermeasures involving social distancing/quarantine, PPE, or systematic testing.

Even more relevant, no reasonable jury could find Dr. Marcowitz played any role in the decision

to house Brown with his ill cellmate after Brown refused another housing assignment.  Fitting

this into the objective reasonableness framework, there is no evidence that Dr. Marcowitz "acted

purposefully, knowingly, or perhaps even recklessly" with respect to decisions about inmate

movement, PPE, or systematic testing of detainees; he simply did not make or contribute to those

decisions.

Administering COVID-19 tests to individual detainees is a different story.  COVID-19 testing is a medical task, and even if Dr. Marcowitz did not perform a test himself, the evidence shows he had the authority to order them and reviewed the tests that were performed.  To the extent that the decision whether to test a specific inmate fell upon Dr. Marcowitz, a reasonable jury could find he acted purposefully, knowingly, or recklessly in making a decision to test or not test a particular detainee.  Thus, he could satisfy the first part of the objective unreasonableness test.

However, Brown cannot show Dr. Marcowitz's decisions about testing him for COVID-19 were unreasonable given the totality of the circumstances.  Brown was first tested and his temperature was regularly monitored in H Block to detect whether anyone in that unit had contracted COVID-19 from exposure in a court proceeding.  That was a reasonable response to the threat, and none of the inmates involved tested positive.

At his request, after being locked down with his ill cellmate, Brown was tested on January 13, 2021, and was negative.  Shortly thereafter, when Brown began experiencing symptoms, Dr. Marcowitz ordered another test that came back positive.[2]  Brown also tested negative before he received the vaccine two months later.  No evidence suggests testing on these occasions was improper, too infrequent, or objectively unreasonable.  Furthermore, no reasonable jury could find additional testing of Brown or his cellmate (or indeed, of anyone else) would have had any impact on Brown's contracting COVID-19.  Dr. Marcowitz's conduct, if any, in testing was not objectively unreasonable considering the totality of the circumstances, and no evidence suggests his testing decisions caused Brown any harm.

---

[2] Dr. Marcowitz's response to that positive test is at issue in Count 4.

2.      <u>Count 4</u>

In Count 4, Brown complains that Dr. Marcowitz's response when he tested positive for COVID-19 in January 2021 was unconstitutional.  Dr. Marcowitz maintains that his response in prescribing Tylenol for fever and aches and Guaifenesin for congestion was reasonable and in conformity with CDC recommendations at the time to treat symptoms with over-the-counter medication.  No other COVID-19-specific treatment existed at that time.  This medical care claim is governed by the objective reasonableness test discussed earlier in this order.  *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020); *see Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

It is clear that Dr. Marcowitz's treatment of Brown with over-the-counter medications was a purposeful act.  However, it was also an objectively reasonable response to Brown's condition and in line with CDC recommendations at the time.  A jury would be hard-pressed to say that following CDC recommendations during the pandemic was objectively unreasonable.  Brown has not specified what else he believes Dr. Marcowitz should have done to treat his COVID-19.  And he recovered in a few weeks.  The Court need not dive into whether COVID-19 caused Brown other long-term problems—even scientists are currently debating the question—because it is enough to say that Dr. Marcowitz's response at the time was objectively reasonable when viewed in the totality of the circumstances.  No reasonable jury could find otherwise.

**V.      Conclusion**

For the foregoing reasons, the Court:

- **GRANTS** Trinity Service Group's motion for summary judgment (Doc. 133);

- **GRANTS** Dr. David Marcowitz's motion for summary judgment (Doc. 136);

20

- **GRANTS** Richard Watson's motion for summary judgment (Doc. 141);

- **DISMISSES** all remaining claims in this case **with prejudice**; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**SO ORDERED.**
**DATED:  April 4, 2024**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

21